UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 4:18CR263 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT JORDAN, III, et al., | ) | OPINION AND ORDER |
| | ) | |
| Defendants. | ) | |

**CHRISTOPHER A. BOYKO, J.:**

Defendants Robert Jordan and Rico Armstrong ask the Court to suppress evidence seized from Defendant Jordan's residence as a result of an unlawful search. (Docs. 44, 46, & 47). Because law enforcement did not have consent to process the crime scene, the Court **GRANTS** Defendants' Motions to Suppress.

## I. BACKGROUND FACTS

A Grand Jury indicted Defendants on various drug-trafficking and firearm related offenses. (Doc. 1). Defendants moved to suppress evidence obtained from the search of 1746 Dodge Street (the "Residence"). (Docs. 44, 46 & 47). The Government responded on February 28, 2019. (Doc. 48). On August 7, 2019, the Court held an evidentiary hearing. From that hearing, the following facts came to light.

Early in the morning of June 1, 2016, City of Warren Police Officers Ladner and Jones responded to a house alarm at the Residence. (Doc. 69, 186-87).[1] Upon their approach, officers

---
[1] Citations to the Suppression Hearing Transcript are formatted as follows: (Doc. 69, PageID #).

determined the house was being burglarized. (*Id.*, 188). Officers could hear talking inside the Residence. (*Id.*). As the officers continued their approach, two-gun shots rang out from the Residence. (*Id.*; Government's Exhibit 2A). Officer Ladner sought cover in the neighbor's yard and requested backup. (Doc. 69, 189).

Backup responded around 4:12 a.m. (*Id.*, 252; Defendant's Exhibit F). Officer Stabile was one of the officers who responded to the scene. (Doc. 69, 252). Officers positioned themselves outside the Residence and eventually coaxed the intruder out. (*Id.*, 190). Even though the intruder said he was alone, officers were not so sure due to the suspect talking while in the Residence. (*Id.*, 190-91).

Simultaneously, dispatch attempted to contact a keyholder for the Residence. (*Id.*, 190). Dispatch eventually contacted Linda Armstrong. (*Id.*, 220; Exhibit E). Ms. Armstrong testified that ADT, the security company protecting the Residence, contacted her at 3:57 a.m. (Doc. 69, 329). According to Linda, she arrived at the scene at 4:10 a.m. (*Id.* at 330), while call reports have Ms. Armstrong en route to the scene at 4:28 a.m. (*Id.*, 220; Exhibit E).

Officer Stabile spoke with Ms. Armstrong when she arrived at the scene. (*Id.*, 238). The officer explained what had occurred at the Residence that morning and what the officers wanted to do next. (*Id.*, 239). Importantly, officers did not know if the Residence was empty or if there were victims inside. (*Id.*). Both Officer Stabile and Ms. Armstrong testified that officers wanted to enter the Residence to ensure the house was secure. (*Id.*, 244; 331). Eventually, Ms. Armstrong provided Officer Stabile with the garage code and keys to enter the Residence. (*Id.*, 239, 331).

Around 4:45 a.m., officers entered the Residence. (Exhibit E). At 4:54 a.m., the Residence was cleared. (Doc. 69, 216; Exhibit E). The officers then briefly regathered and

2

entered the home a second time around 5:00 a.m. (Doc. 69, 222; 243; 247; Exhibit E). This secondary sweep was a bit more thorough, but still only looking for people or in places where people could hide. (Doc. 69, 247). By 5:17 a.m., police had finished the secondary sweep (*Id.*, 252; Exhibit F) and the keys to the Residence were returned to Ms. Armstrong. (Doc. 69, 244).

Around 5:29 a.m., Detective Laprocina of the Warren City Crime Scene Unit arrived at the Residence. (*Id.*, 255). By the time Detective Laprocina arrived, Defendant Armstrong—a second keyholder—was also present at the scene. (*Id.*, 192; 195; 256). Officer Ladner debriefed Detective Laprocina. (*Id.*, 258). After doing so, Officer Ladner informed both Ms. Armstrong and Defendant Armstrong about Detective Laprocina's presence. (*Id.*, 195). Officer Ladner told the Armstrongs that Detective Laprocina was "gonna go through…and take some pictures…and…do his thing, he's the crime scene guy…" (Exhibit 3A). Both Ms. Armstrong and Defendant Armstrong responded neutrally, not raising any issues with Detective Laprocina's involvement. (Doc. 69, 195-96.)

Fully debriefed, Detective Laprocina entered the Residence and began his collection of evidence. (*Id.*, 259). He was looking for, and gathering evidence related to, the burglary and shooting that occurred earlier that morning. (*Id.*, 258-59; 261). Detective Laprocina performed an initial walk-through and determined what equipment he needed to process the scene. (*Id.*, 258-59).

At 6:12 a.m., before Detective Laprocina entered the Residence to commence taking photographs, Detective Gambill arrived at the scene. (*Id.*, 296). Detective Gambill is a narcotics officer for the City of Warren. (*Id.*, 297). Her supervisor, Lieutenant Hoso, called her to the scene earlier that morning. (*Id.*, 294).

Detective Gambill accompanied Detective Laprocina as he took pictures throughout the Residence. (*Id.*, 268; 297). During this walk-through, Detective Gambill observed signs of narcotics trafficking. (*Id.*, 271). Eventually, Detective Gambill had seen enough evidence of narcotics that she left the scene to obtain a search warrant for narcotics. (*Id.*, 274). Detective Gambill testified that almost everything she relied on to obtain the search warrant was based on items she observed when she entered the Residence with Detective Laprocina. (*Id.*, 317).

Detective Gambill returned to the scene around 12:15 p.m. to execute the search warrant. (*Id.*, 303). As a result of that search, officers uncovered large quantities of drugs, money, drug paraphernalia and loaded firearms.

Defendants moved to suppress the evidence. They claim that officers unlawfully searched the Residence without a warrant when they processed the crime scene after the protective sweeps. The Government counters, arguing that officers had consent from both Ms. Armstrong and Defendant Armstrong to search the Residence in the manner they did.

## II. LAW AND ANALYSIS

### A. Standard of Review

The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

Absent some exception to the Fourth Amendment, "police may not conduct a warrantless search of an individual's home." *United States v. Reed*, 141 F.3d 644, 648-49 (6th Cir. 1998). A search predicated on consent, however, constitutes a recognized exception. *Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011) ("The Fourth Amendment permits a search without a warrant if valid consent to search is given"). "'The government bears the burden of demonstrating by a preponderance of the evidence, through 'clear and positive testimony,'…that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *Lucas*, 640 F.3d at 174 (quoting *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009)). "[W]hether a consent to a search was in fact 'voluntary'…is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227.

A search predicated on consent however, is circumscribed by the object of the search. *Reed*, 141 F.3d at 649; *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The scope of a search is generally defined by its expressed object"). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect[.]" *Jimeno*, 500 U.S. at 251.

The question before the Court is whether Detective Laprocina had consent to enter the Residence. The Government is basing Detective Laprocina's entry on the consent received from Ms. Armstrong or Defendant Armstrong.

### B. Defendant Armstrong's Expectation of Privacy in the Residence

Before analyzing whether Ms. Armstrong or Defendant Armstrong consented to the search of the Residence however, the Court must first determine whether Defendant Armstrong can challenge the search. Defendant Armstrong can do so only if he has a legitimate expectation of privacy in the Residence. Defendant Armstrong claims he does. The Government disagrees.

In order to challenge a search under the Fourth Amendment, Defendant Armstrong must demonstrate[2] he had "an expectation of privacy in the place searched" and that "his expectation was reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *see also United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000). "A defendant must satisfy a two-pronged test to show a legitimate expectation of privacy: 1) he must manifest an actual, subjective expectation of privacy; and 2) that expectation is one that society is prepared to recognize as legitimate." *Pollard*, 215 F.3d at 647 (citations omitted).

In determining "whether a legitimate expectation of privacy exists[,]" courts:

> consider 'the person's proprietary or possessory interest in the place to be searched or item to be seized[;]' 'whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.'

*United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (quoting *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000)).

Additionally, "reviewing courts should consider whether there was a 'previous relationship' with the apartment lessee or if there are any indicia 'of acceptance into the household.'" *United States v. Heath*, 259 F.3d 522, 532 (6th Cir. 2001) (quoting *Carter*, 525 U.S. at 90).

Considering the current status of case law within the Sixth Circuit,[3] the Court holds Defendant Armstrong demonstrated a legitimate expectation of privacy in the Residence.

---

[2] The burden is on Defendant to demonstrate a legitimate expectation of privacy in the place searched. *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008).

[3] *See United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009) ("The Sixth Circuit has generously construed the Fourth Amendment as protecting nearly all overnight guests, even when the guest occupies a common area in the apartment that is not private from other residents. In certain cases, this circuit has even extended standing to challenge a search to non-overnight guests who are permitted to keep items in the residence") (citations omitted).

Defendant Armstrong's uncle, Defendant Jordan, owns the Residence. (Doc. 69, 295; Exhibit A). Defendant Jordan granted Defendant Armstrong access to the house by providing housekeys. (Doc. 69, 192; 194). With those keys, Defendant Armstrong had the right to exclude others from the Residence. Defendant Armstrong took precautions to maintain security by repairing previous burglary attempts and installing an alarm system. (*Id.*, 223-24; Exhibit A). Defendant Armstrong kept mail and a credit card at the Residence. (*Id.*, 320; Exhibit H3). He also slept there on occasion and kept personal items there, such as clothes and photographs. (Doc. 69, 194; Exhibits A; G1; G2; I). Officers viewed Defendant Armstrong as a victim of a burglary throughout their investigation. (Doc. 69, 200; 224). Taken collectively, the facts demonstrate Defendant Armstrong had a subjective expectation of privacy in the Residence that society would recognize as legitimate.

The Government's argument that Defendant Armstrong has no privacy interest because he does not own the Residence is without merit. The United States Supreme Court has been clear: "a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." *Rakas v. Illinois*, 439 U.S. 128, 142 (1978); *Olson*, 495 U.S. at 97-98; *see also Heath*, 259 F.3d at 532. Moreover, Defendant Armstrong's apparent distancing from the Residence is not enough. In the same conversation he still admitted to sleeping at the Residence on occasion and being there the night before the burglary. Indeed, the facts in this case are like previous Sixth Circuit decisions that determined the defendant could challenge the search on Fourth Amendment grounds. *See Pollard*, 215 F.3d at 647-48 (defendant could challenge search when he had a seven-year relationship with homeowner, stayed at house earlier in the week, occasionally spent night at residence on coach, kept personal belongings and was allowed to stay

7

at residence even when homeowner was not present); *Heath*, 259 F.3d at 533 (allowing defendant to challenge a search when defendant slept on couch as often as once a week for approximately two years; possessed a key that granted him access and the right to exclude others; and was related to the owner of the premises); *United States v. Washington*, 573 F.3d 279, 286 (6th Cir. 2009) (defendant allowed to challenge search of apartment owned by uncle when defendant stayed at apartment while uncle was incarcerated).

Moreover, the fact that Defendant may have committed criminal acts while at the Residence is not dispositive. The Government relies on *Minnesota v. Carter* in arguing that, because Defendant Armstrong utilized the Residence to manufacture heroin, he has no legitimate expectation of privacy. While *Carter* recognizes that the "commercial nature" of a defendant's presence may not lead to a privacy interest, 525 U.S. at 90-91, *Carter* is factually distinct from the present case. *Carter* determined that the "purely commercial nature of the transaction, relatively short period of time on the premises, and lack of any previous connection between [defendants] and the householder" led to the determination that defendants did not have a reasonable expectation of privacy in the third-party's residence. 525 U.S. at 91. But here, Defendant Armstrong spent at least six months in the Residence and had a connection with the householder, his uncle Defendant Jordan. (Exhibit A). Additionally, unlike the direct observations in *Carter*, there was no testimony that Defendant Armstrong solely utilized the Residence for trafficking narcotics throughout all those months. Thus, it appears Defendant Armstrong had been lawfully maintaining the Residence for several months, and "the notion that drug use or illegal activity eviscerates any right to challenge a search cannot possibly be sustained." *See Washington*, 573 F.3d at 283 ("the use of space for illegal activity does not alter the privacy expectations of a person who would otherwise have standing").

Accordingly, Defendant Armstrong has a legitimate expectation of privacy in the Residence and may challenge the search.

C. **Ms. Armstrong's Consent**

The Government maintains that, by providing garage access and the keys to Officer Stabile, Ms. Armstrong consented to a general search of the Residence. Defendants counter, claiming Ms. Armstrong consented to a limited search of the Residence for victims or additional suspects. Upon review of the evidence, the Court agrees with Defendants.

The evidence from the hearing demonstrates authorities desired access to the Residence to check for victims and other suspects. Officer Ladner testified police needed entry to ensure no victims or suspects were in the house. (Doc. 69, 190-91). Officer Stabile, who asked Ms. Armstrong for the keys, testified police were unsure if there were additional occupants and they needed entry to check for victims and suspects. (*Id.*, 239; 244). Ms. Armstrong, the alleged consenter, testified she gave Officer Stabile the keys after he informed her that police were unsure if there were additional suspects or victims. (*Id.*, 331). Thus, the typical, reasonable person watching the interaction between Officer Stabile and Ms. Armstrong would have understood the scope of consent was to search the Residence for suspects or victims. *United States v. Caudill*, 25 Fed. App'x 349, 354 (6th Cir. Dec. 28, 2001) (The *Jimeno* objective reasonableness test "implies that the assessment of objective reasonableness is made as of the time of the conversation between the consenting party and the police").

In line with this consent, police did just that—searched for bodies. Twice.[4] When authorities did not find any persons, cleared the Residence and returned the keys to Ms.

---

[4] There was much focus on the two immediate searches police performed in this instance, and whether the searches were separate or one protective sweep. Since the Court finds Detective Laprocina's third search was unreasonable, the Court will not address the reasonableness of the secondary-protective search.

9

Armstrong. Ms. Armstrong's consent terminated. Contrary to the Government's position, Ms. Armstrong was not required to place limits on the search because the requested search was already limited—a search for persons. As the expressed object of the search was limited to bodies, Ms. Armstrong's consent to search was likewise limited.

Thus, law enforcement exceeded Ms. Armstrong's expressed consent when they reentered the Residence for a third time. Unless the third reentry was predicated on different consent or a different exception to the Fourth Amendment, any evidence uncovered as a result of the third reentry must be excluded.

> **D.    Defendant Armstrong's Consent**

The Government claims Defendant Armstrong (and Ms. Armstrong) consented to Detective Laprocina's entry into the Residence when Officer Ladner explained Detective Laprocina's role at the Residence. Defendants disagree. Instead, Defendants claim Defendant Armstrong merely acquiesced to a show of authority. Thus, Defendant Armstrong did not consent 'freely and voluntarily.'

The audio recording reflects Officer Ladner said the following to Defendant Armstrong:

> Well, I mean, I guess when he gets, uh, so the detective [Laprocina] came out…and he's gonna…he's gonna, he's gonna go through and uh, and take some pictures…and all that…do his thing, he's the crime scene guy, and uh, I'll get your information…um, we'll do a report…charge him at least for now for burglary, then once he gets done, um when's the last time anybody was here?…So then after he gets done, and we get done doing whatever, and then we'll figure out maybe, if anything, was taken.

(Exhibit 3A).

Throughout Officer Ladner's discussion of Detective Laprocina, Defendant Armstrong is heard saying "Ok" and "mm hmm" in affirmation. (*Id.*). The Government also cites subsequent conversations between Officer Ladner, Defendant Armstrong and Ms. Armstrong, but those

10

conversations relate to a time after Detective Laprocina already entered the Residence and concern the timeliness of Detective Laprocina's process.

The Court agrees with Defendants. The above conversations do not demonstrate that either Defendant Armstrong or Ms. Armstrong consented to Detective Laprocina's entrance into the Residence. As stated above, it is the Government's burden to show the Armstrongs freely and voluntarily consented under the totality of the circumstances. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). While it is true that someone can consent "in the form of words, gesture, or conduct," *United States v. Carter*, 378 F.3 584, 587 (6th Cir. 2004), it cannot be shown by "acquiescence to a claim of lawful authority." *Bumper*, 391 U.S. at 548; *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (consent must be "uncontaminated by any duress and coercion").

An objective review of the totality of the circumstances reflect that the keyholders were aroused from sleep early in the morning to messages of a burglary and shots fired from the property they were maintaining. The keyholders arrived to a frenzy of police activity. Police, with Ms. Armstrong's consent, entered the residence and performed two searches for additional occupants. Upon completion of the protective sweeps, police returned the keys to Ms. Armstrong. But a police presence remained. While a few police departed from the scene, additional investigators arrived. Detective Laprocina arrived and Officer Ladner explained the detective's role to both Ms. Armstrong and Defendant Armstrong. Officer Ladner told the keyholders Detective Laprocina was going to "do his thing." Ms. Armstrong testified she tried to reenter but was kept out by an officer at the scene. (Doc. 69, 332-33). While the testifying officers deny they witnessed Ms. Armstrong try to reenter, they all agreed they would have kept

11

Ms. Armstrong from entering the Residence until Detective Laprocina finished. (*Id.*, 212; 225; 249).

Importantly, no officer directly asked either Defendant Armstrong or Ms. Armstrong for permission to reenter the Residence after the protective sweeps. Instead, Officer Ladner testified he told the keyholders what is going to happen and that he did not ask for permission. (Doc. 69, 224). Detective Laprocina never asked for permission; rather, he arrived at the scene and began his processing. (*Id.*, 266). Detective Gambill never asked for permission. (*Id.*, 268; 297). In fact, she did not even see either Defendant Armstrong or Ms. Armstrong when she arrived. (*Id.*, 270-71). The Court finds it difficult to obtain someone's consent to a question that was never posed.

The case of *Shamaeizadeh v. Cunigan*, 338 F.3d 535 (6th Cir. 2003) is illustrative to this matter. In *Shamaeizadeh*, a resident of a two-unit building requested a police presence to search for a possible burglar. 338 F.3d at 541. An officer arrived and determined there was no burglar at the residence. *Id.* During his search however, he thought he smelled marijuana. *Id.* He requested backup. *Id.* A second officer arrived and the two searched the residence again but did not ask for permission. *Id.* They noticed more evidence of marijuana. *Id.* The officers then requested additional support from a narcotics officer. *Id.* at 542. Upon the narcotics officer's arrival, the officers searched the residence a third time. *Id.* Officers performed the subsequent two searches in the presence of the resident, but never directly asked her for permission to search. *Id.* Rather, officers simply never left the residence and instead searched the premises while the resident followed along. *Id.*

The Sixth Circuit determined the second and third searches were unconstitutional. *Id.* at 546. Analyzing the searches based on consent, the court determined that officers could not have

had an objective reasonable belief that the second and third searches were within the scope of the resident's consent. *Id.* at 547-48. Officers were called to the scene to search for a burglar. When no burglar was found, the scope of the search ended. *Id.* at 547, n.5. The resident's consent to search the residence for a burglar does not provide objective consent for the officer to request backup and execute a second and third search. *Id.* at 548. Accordingly, the second and third search exceeded the scope of the resident's consent. *Id.*

Similarly, officers here responded to an active burglary at the Residence. They eventually removed the burglar but remained unsure if the house contained additional occupants or victims. They therefore sought and received consent to perform a limited search for bodies, like the officer in *Shamaeizadeh*. Once the house was cleared, the scope of the search ended, like the search for the burglar in *Shamaeizadeh*. However, similar to the officers in *Shamaeizadeh*, officers remained at the scene and waited for Detective Laprocina to process the scene. Accordingly, like the second and third searches in *Shamaeizadeh*, Detective Laprocina's search is likewise unreasonable and therefore unconstitutional.

Since the third entry violated Defendants' Fourth Amendment rights, any evidence must be excluded as "fruit from a poisonous tree" unless some exception applies to the exclusionary rule.

### E. Inevitable Discovery Doctrine

The Government argues the evidence would have inevitably been discovered and thus remains admissible. "The exclusionary rule prohibits admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). "The

13

inevitable discovery doctrine, an exception to the exclusionary rule, allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *Id.* (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). If the evidence can be discovered through lawful means, "then the deterrence rationale has so little basis that the evidence should be received." *Nix*, 467 U.S. at 444.

The inevitable discovery exception "applies when the government can demonstrate either [1] the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence[;] or [2] other compelling facts establishing that the disputed evidence inevitably would have been discovered." *Kennedy*, 61 F.3d at 499; *United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008). The 'other compelling facts' prong of *Kennedy* entails following routine procedures or some other private search without governmental involvement. *See United States v. Kimes*, 246 F.3d 800, 804 (6th Cir. 2001) (proof that contraband would have been detected in an inventory search that would inevitably follow seizure of a car is sufficient to invoke the inevitable discovery exception to the exclusionary rule); *Kennedy*, 61 F.3d at 500-01 (inevitable discovery exception applicable where airliner's lost luggage policy would have opened a lost suitcase and uncovered the narcotics in a private search had police not intervened).

Here, after "viewing affairs as they existed at the instant before the unlawful search," *Alexander*, 540 F.3d at 502, there was no evidence of an independent, untainted investigation into Defendants or the Residence. The Government concedes as much, arguing instead that "other compelling facts" support the inevitable discovery. According to the Government, "[t]he drug paraphernalia was in plain view, and therefore would have been found and seized had officers only searched the residence following consent to search." (Doc. 70, 369). But as the

Court previously determined, authorities did not have consent to search. The Government's first argument is not persuasive.

Alternatively, the Government argues that "if someone had revoked consent, the officers would have sought a search warrant (and been able to obtain it) to search for evidence related to the burglary and assault." (*Id.*). While the Court agrees there likely was probable cause to obtain a warrant to search the Residence, this argument has been repeatedly rejected by the Sixth Circuit.

In *United States v. Quinney*, law enforcement entered a bedroom and seized evidence without a warrant or consent. 583 F.3d 891, 893 (6th Cir. 2009). There the government made a similar argument as it does here—that officers had probable cause to obtain a warrant at the time of the seizure, thus the evidence would have been inevitably discovered. *Id.* at 894. The Sixth Circuit disagreed with the Government, holding that such a position would run counter to the "[Sixth Circuit's] commitment to the Fourth Amendment's warrant requirement." *Id.* at 894-95 (collecting Sixth Circuit cases holding the same).

Similarly, before Detective Laprocina entered the Residence, authorities likely had probable cause to obtain a warrant to search the Residence. Instead of obtaining a warrant, Detective Laprocina entered the property without one. If the Court accepted the Government's position that it 'could have obtained a warrant,' it "would completely obviate the warrant requirement and would constitute…a radical departure from the Fourth Amendment warrant requirement precedent." *Untied States v. Haddix*, 239 F.3d 766, 768 (6th Cir. 2001).

Furthermore, by accepting the Government's argument under the inevitable discovery doctrine in this scenario, the Court would be establishing a crime scene exception to the Fourth Amendment. The Government rightly does not advocate for that exception as the Supreme

Court has been clear that no such exception exists. *See Mincey v. Arizona*, 437 U.S. 385 (1978); *Thompson v. Louisiana*, 469 U.S. 17 (1984).

Since the Government has not established by a preponderance of the evidence either the existence of an independent, untainted investigation; or other compelling facts that demonstrate the evidence would inevitably be discovered, the inevitable discovery exception to the exclusionary rule does not apply.

### III. Conclusion

Law enforcement did not have consent to enter the Residence a third time and process the scene for evidence related to the burglary and assault on police. And since police did not have a warrant, the third reentry was unreasonable and therefore a violation of the Fourth Amendment. Since Detective Gambill based her Affidavit for a search warrant on facts she uncovered during the third reentry, those facts must be excised from the Affidavit. Finally, the Government failed to establish by a preponderance that the evidence it seeks to introduce would have been inevitably discovered in a lawful manner. Thus, any evidence uncovered or learned about during Detective Laprocina's search of the Residence must be excluded. Defendants' Motions to Suppress are **GRANTED**.

**IT IS SO ORDERED.**

                                            s/ Christopher A. Boyko
                                            **CHRISTOPHER A. BOYKO**
                                            **United States District Judge**

**Dated: October 21, 2019**